The next case this morning is 5210267 People v. Glass. Arguing for the defendant appellant is Levi Harris. Arguing for the state is Chelsea Nielsen. Each side will have 10 minutes for the argument. The appellant will also have five minutes for rebuttal. Please note only the clerk is permitted to record these proceedings. Well, nice to see you again, your honors. Again, I'm assistant defender Levi Harris here on behalf of the appellant, my client Christopher Glass. May it please the court. Christopher Glass's Fifth Amendment right to silence was violated where Mr. Glass invokes that right multiple times during his interrogation in custody by police. The officers failed to scrupulously honor the right that he was invoking and the trial court allowed Mr. Glass's subsequent incriminating statements to be used against him at trial. The state cannot show that this constitutional error was harmless beyond a reasonable doubt and this court should accordingly reverse and remand. First, let's recall what the law says about the Miranda right to silence. We know from federal and Illinois case law that if an accused invokes his right to silence at any time during a custodial interrogation, he cannot be questioned further unless police scrupulously honor the invocation and even then, not unless or until the accused himself reinitiates that conversation. In this case, a reasonable officer would have recognized that Mr. Glass was invoking his right to remain silent and subjectively, the detectives here did recognize that because they kept putting up their on the police to scrupulously honor the invocation. Scrupulous means taking great care to do what is right or proper with a conscious effort to avoid doing wrong. So, with that in mind, consider that Mr. Glass invoked his right to silence three separate times during this interrogation. His first invocation, this is what he said, you know what, let's stop this whole conversation, how about that, I'm done with this conversation, sir. And the police response from Detective Rossiter was to put up his hand and tell him stop, stop, stop and three separate times over the next few lines in the transcripts, the detective tells my client to stop and listen, stop and listen. So, what the police had the duty to do at that point was to stop the interrogation or if there were any lack of clarity, there wasn't here, but in a case where a guy said, well, I think maybe I should stop talking or something like that, where it was ambiguous, the police can ask these clarifying questions. That's not what happened here, rather than stopping the interrogation, the detective sought to stop the invocation of silence himself. The police were the ones who were in the positions of power, they were the later went on to answer more questions, can't muddy the emphasis and the clarity of what he actually said in this invocation. If police, this goes for all three of the invocations, if police can do what they did in this case by interrupting the invocation, not to stop the interview, but to stop and talk the defendant out or suspect at that point, out of invoking his Miranda rights, then Miranda's pretty much going to be a dead letter because police can keep arguing with the suspect until they wear him or her down and that person continues to talk to the police. So, after this first invocation, the only inculpatory statement that Mr. Glass had made, or excuse me, before this, the only inculpatory statement or arguably inculpatory statement was that he and the victim, Ms. Mattingly, were arguing over a book bag, there was a pistol inside of it, and it went off. Between the first invocation and the second invocation, he maintained that, he said all there was was just a single shot and stuck by that. The second invocation, when it came about, was a little more colorful, and I'm not going to quote it exactly, but he said, just effing do it, let's go, and he sits back like this, I'm done effing talking. Again, three separate times, Detective Rossiter's response to that was to tell him, stop and listen, stop and listen, and then to tell my client, this is your only opportunity to tell us what happened. So, you begin the interview, which at that point, what they were telling my client was just for a parole violation, which is fine, that's what they picked him up on. Mirandize him, and tell him he's got the right to remain silent, and then when he tries to invoke that right, tell him, no, no, no, no, no, excuse me, not no, stop, stop, stop, listen, this is your only chance to tell us what happened, to tell your side of the story, and he even says, the detective says in this case, I would hate for you to be told that you're silent. That's literally what the Constitution permits the client to do. Between that invocation, which was again ignored, and the third invocation, Mr. Glass still insisted that he was only responsible, arguably, for one gunshot in this case. Did you have a question, Your Honor, or just a frog? Just to clarify my throat. Okay, good job. The third invocation was when Mr. Glass said, I don't want to talk anymore. After that invocation, which again, the police did not stop the interrogation in honor, is when all of the inculpatory stuff about first degree murder came in. So, if either of the first two, certainly, and even the third invocation had been honored, all of the evidence of first degree murder would have been kept out of this trial, or wouldn't have come up in the first place in the interrogation. So, that's the invocations, that's what the police response to it was. I guess, to their credit, the state in its brief doesn't even attempt to argue that what the police did here was scrupulously honoring Mr. Glass' invocations. Instead, they put all their eggs in the basket of, well, these weren't invocations in the first place. We disagree with that. The police have to stop these interrogations when there's an invocation and scrupulously honor that. Once that an error has been shown, which it has been in this case, the state is the one who bears the burden in this instance, not just to show that the error was harmless, but to show it was harmless beyond a reasonable doubt because it's a constitutional error. So, we know that this is not harmless for a few reasons. First of all, the trial court itself said that the reason it wouldn't give lesser-included offense instructions for involuntary manslaughter and second-degree murder was because of what Mr. Glass said in this interrogation video after that third invocation had been ignored. The state doesn't offer any response to this, to the fact that the trial court itself said, look, I would give and let the jury decide about these lesser-includeds, but for what you said in that tape after this invocation. So, that's the first instance of prejudice being quite obvious on the record. But second, more globally, this was the only evidence in this trial that Mr. Glass was responsible for Ms. Manningly's murder in a way that was something more than an accident. So, the state goes to lengths in its brief to say, he was out there, he admitted being out there in the country on this property with this woman. Several people were out there. I don't know whether they were doing drugs or they were just chatting, who knows what they were doing, but there were multiple people out there. And the only one who testified besides, well, Mr. Glass didn't testify, but the only one who testified was a woman who said that the victim was alive and well when she last saw her. So, there were multiple people out there. Just being out there doesn't make Mr. Glass guilty of anything. There were multiple gunshots to this woman. Nobody disagrees with the fact that she died of gunshot wounds, that her body was discovered later, all these other things that the state points out as overwhelming evidence. But there was no overwhelming evidence on this central issue of, again, the stuff that would have made the difference between intentional murder and the lesser included defenses. That prejudice came in through this statement, and therefore the state can't show that it's harmless. So, unless the court has questions, I'm more than happy to entertain them. The court should reverse and remand for a new trial without this statement. Counsel, when you view this videotape confession, isn't it just one long conversation? And the invocations you indicate that the defendant made, wasn't that him simply disagreeing with the police officer and insisting and getting angry that only one shot was fired? No, your honor, I would disagree with that characterization. First of all, the reason that it was one long conversation was because the police didn't honor his right to remain silent when he said he wanted to do it. The state in its brief said, well, he went on the offensive. He's handcuffed to the table. He's got two Illinois state police agents in there. It's not like he can just get up and walk out and end the interview. So, the reason it's one continuous conversation was because all of these attempts to invoke his Miranda were ignored. But I would disagree that saying, I'm done effing talking is just a the details of the potential offense. Did I clarify that or do you need more? Okay. But to follow up with Justice McHaney, isn't that goes to the standard and that the trial courts to look at all the evidence, manifest weight and make a determination based on the circumstances, body language, what is said, everything together, not just little snippets of the entire conversation. Your honor, I would say that's exactly right. And the snippets are the ones where there are the invocations. But I would encourage you again to watch the entire video, have your clerks look at the video. I think the entire video is relevant to what's going on or de novo for the whole thing, because essentially the court is in the same position that the trial court was in to look at this video, look at the body language and all that stuff. It's not like it usually is where there are live witnesses and stuff. There were live witnesses, but the basis for the ruling was on this video. But even under the clear error standard, it is clear that the trial court aired here because the things that he said, or excuse me, the judge said that Mr. Glass said are not, they don't comport with what's on the video. And so your honors are free to look at that and to don't take my word for it. But what the trial court said is basing its ruling on were words that the client didn't actually say. And the subtle differences between those that in everyday conversation might not make that much difference, make a huge difference when you're talking about whether this guy's trying to invoke his constitutional rights. Well, thank you, counsel. Justice McKinney or Justice Cage, do you have any questions? No, nothing further. Obviously, Ms. Harris will give you your time for rebuttal, but Ms. Nielsen, go right ahead. May it please the court, counsel Chelsea Nielsen on behalf of the state. Your honors, we start this case with a few agreements between the state and opposing counsel. The defendant in this case did waive his Miranda rights after they were read to him by agents Rossiter and Smith before beginning an interview about the disappearance and murder of the victim in this case. Second agreement is that there was never a break in the interrogation. And finally, before any alleged invocation, the defendant had admitted that the victim had been shot at least once. Now, unless the court has any specific questions it wants to dive right into, I would first like to briefly discuss the additional authority that was filed by my people versus ward that was shared with me in advance of filing with the court. And so I did have an opportunity to read the opinion and I would just briefly like to address that. The state does not believe that while the case is well written, it's particularly instructive for the case we're discussing today. Word is quite distinguishable from the facts we're dealing with here. The state does not believe that ward changes the analysis or the facts when looking at this case. All of the cases cited in ward of a defendant invoking a right to silence, those invocations were close in time to being Mirandized. Additionally, some of the invocations were in response to being asked if the defendants wanted to talk to the police. Ward is dealing with instances where the police have stopped the interrogation because of the defendant invoking the right to silence. In ward, they left, allowed some time to pass, and then they came back and they never re-Mirandized the defendant. This case does not deal with a break in time in the interrogation. Ward also deals with evidence and testimony that is not as strong as the case we're discussing today. The kind of evidence presented in ward also appears to be different than the evidence that was presented in this case. Now, there are several cases in ward that the first district found distinguishable from their case that I do find applicable here. Specifically, when the Illinois Supreme Court made clear in Pieperold v. Nielsen that a questioning officer's reaction to a purported invocation is often relevant to the analysis. And Justice Bowie is correct that the totality of the circumstances have to be considered in this case when reviewing the motion to suppress. That also includes the testimony of the officers who testified during the motion to suppress about how they interpreted the defendant's alleged invocations of his right to silence. So, the demand to end the interview must be specific. No argument there. Now, the statements taken in isolation in this case appear to be clearer than they are when reviewed and considering the conversations in their entirety. And the statements should be taken in their entirety and the context in which the statements were made. The same is true of comments made of the trial court's decision during its ruling on the motion to suppress. Entire context and statements are important, which is why the state included the entire finding of the trial court in its brief. The defendant largely focuses on the statements in isolation, but this court should consider the full context of the conversation. Ms. Nielsen, when someone says, you know what, let's stop this whole conversation. How about that? I'm done with the conversation. And then the police officer puts up his hand and says, look, this is important. You stop. He's actually telling the defendant to stop invoking his right to silence. What do you have to say about that? Your Honor, I believe that in that instance, it's clear both from the testimony of Agent Rossiter and in reviewing the video that the conversation was getting what I would call heated. The defendant, in that part of the interview, they were discussing what the defendant's story was. And the defendant was getting mad at Agent Rossiter. And it appears that he might have been getting a little heated and speaking with the defendant as well. The defendant was arguing with the agent and he was getting emotional. Doesn't a defendant have the right to stop a conversation when he gets emotional? He does. He does have a right to stop the conversation. However, Agent Rossiter testified at the motion to suppress that he didn't interpret that as an invocation of a right to silence, but rather that he was making an assertion that he didn't like what Agent Rossiter was saying, which again, this goes to the surrounding conversation around that statement, which was that like, oh, you know my story, like you think you already know it, what my story is, but I know my story. That was essentially the context of where that statement arose. The defendant accused the officer of basically trying to put words in his mouth. But as the trial court pointed out in its ruling on the motion to suppress, the defendant's body language in the video was engaged. It was faced more directly at Agent Rossiter. The body language in particular was something that the trial court did specifically note in its ruling as something that it had focused greatly on in ruling on that particular statement in this case. And again, Agent Rossiter's the motion to suppress was also enlightening of how the officer had interpreted the statement that was made at that time. And to him, he said that it was more of an assertion of he was getting mad that he said that he was basically putting words in his mouth. And so taking Agent Rossiter's testimony in the trial court's finding and reviewing the video of the interview allows the viewer to see, you know, the body language, the context and the logic of the interpretation of the exchange and how a reasonable objective officer interpreted the statement made by the defendant. And so going from that first statement to the second statement, the ruling was that that statement was very ambiguous. Agent Rossiter had testified that prior to the defendant making the statement of like, in the full context, it seemed like he was ready to just be done and get ready to give the information that Agent Rossiter wanted or needed so that he could move on with his day essentially. The trial court held that it was easy to interpret the statement to mean that he just wanted to change the subject. And in fact, even though he said I'm done effing talking, that's what you're defendant casually cussed throughout the interview. So his cussing isn't really indicative of a particular feeling. I think it goes more to his standard dialect and way of speaking. So I don't think that. Yeah, thank you. I agree. But that could work against the state because that means he's not so emotional. This is just how he speaks. Yes, Your Honor. However, I don't believe that this statement was taken as much on emotion as ambiguity. Around this statement, Agent Rossiter had said something along the lines of, we know where we are and we know where we're going. And the defendant had kind of sarcastically asked, well, and what do you need from me if you already know everything? However, in looking at his body language, it also looks like it's signaling a desire to participate and speak with the officers. And he did continue to speak with them after that second alleged invocation. And the trial court found that this was an ambiguous statement that wasn't clear on exactly what the defendant wanted at that particular instance. On the second invocation, as it's been alleged, didn't the officer once again say stop and listen? He said to the defendant, stop and listen once again, as he had done before. Your Honor, I cannot recall off the top of my head if that was the direct response by Agent Rossiter on that second invocation. I'll take my word for it. Okay. Even assuming that it was, Your Honor, again, this was kind of a high-impact interview. And what I mean by that is they're talking about a lot of serious conversation. We're talking about murder. We're talking about illegal drug use. We're talking about hiding a body. And so I think that even that hand gesture by the officer has to be taken under the totality of the circumstances of how is he reacting to the defendant? What was the full context of the conversation that they were having? What is the body language of both of them, really? Because in that particular instance, they were fully engaged with each other and having a direct conversation about what had happened to the victim. And just very briefly, I would like to close out with a quick note on the third invocation. The trial court viewed that statement as a clarifier to, I don't want to try anymore, and then a follow-up of, I didn't fire more than one shot. Like, he didn't want to try to lie to the police anymore. He just wanted to get the confession over with. And for those reasons, we would ask this court to affirm the ruling of the lower court. Thank you. Well, thank you, counsel. Before we move on, Justice McHaney or Justice Cage, do you have any questions? No questions. All right. Well, thank you, Ms. Nielsen. Mr. Harris, go right ahead. Yes, Your Honor. So, first of all, the state just once again engaged in the same error that it did in its brief, which was to misquote my client as saying in the second invocation, let's get this over with. And in the third invocation, to say, well, I don't, you just something about, let's just get this over with, or I'm just ready to get this done, or whatever. He did not say that. In that second invocation, as Justice Cage has pointed out, he said, let's have him do it. Let's go. Leans back against the wall like this. So, the idea that, you know, the state puts a spin on it, well, he just wanted to go ahead and get his confession out, get it off his chest so he could go about his day. He knew he wasn't going anywhere. He knew he was under arrest on that parole violation, regardless of what happened here. He was not going home. And so, sure, maybe he knew he wanted to go someplace. He wanted to go back to his cell and stop the conversation. If I'm done effing talking is not an emphatic and clear invocation of a right to stop talking, I don't know what is. I mean, I just, I can't imagine other than just, and I say it, and I know it's kind of humorous to imagine, but it happened, I believe, in that Nelson case, where a man put his fingers in his ears and started humming to stop the officer from asking him any more questions. Absent that, I don't know how a person could be any more emphatic. Now, so when you say he folded his arms to lean back against the wall, didn't he, wasn't most of the interview him leaning back against the wall? Very, very brief part of it was when he leaned forward and was angry and on the table. Your honor, I don't know about that because this is what I focused on the body language specifically that the trial court noted in the invocation. So how did that either explain or take away from or whatever was coming out of his mouth? I don't dispute that, if that's your honor's recollection of what's on the video of mostly sat back against the thing. But I do think that if he's leaning forward and he says, I've got nothing talking, I think that that's not, okay, let me get back to my comfortable position, I'm calm now. I think that's to underscore the fact that he wants to disengage from this whole thing. Of course, this is a heated conversation. It's always going to be a heated conversation when we're talking about first degree murder and things like this. There's no exception for police to jump in and try to stop somebody from their invocation when they're angry and you're only allowed to make these appeals to your Miranda rights when you're somehow calm, cool, and collected. It's almost always going to be the case that there's a fear or there's an unhappiness going on because that's the reason that you, I mean, the counsel said that the detective's testimony was such that he thought these invocations were ambiguous. I would say that's clearly erroneous for two reasons. One, once again, the court can look at that video and decide whether a reasonable officer would interpret those invocations as being what he did was to not only put up his hand and stop, but specifically on this second invocation, he said, I would hate for you to be told you're responsible for things you didn't do because you chose not to tell the story. You chose to stay silent. He knew exactly what the client was trying to do and he set about talking him out of it. There was no ambiguity in this case. And so whether, again, I'm not up here to say that the detective was lying in his testimony. It could be a false memory. It could be any number of things. I don't know how recently he had reviewed the video when he testified, but it doesn't comport with what took place on the video itself. I would agree with the state's characterization that this case is a little bit different than the Ward case, which we moved and it still hasn't been ruled on. I assume your honors will rule on it at some point. But the Ward case was better for what the police did because they at least stopped before they came back and resumed their interrogation. It never stopped here. That does not go to the police's credit. Counsel also said that, well, the evidence wasn't as strong in Ward. That's also not the case. There were multiple witnesses who identified that man as the shooter in that case. Here, the only person who identified a shooter was Mr. Glass himself and only after his rights had been violated. Does that end your rebuttal, Mr. Harris? Yes. The end. I apologize. I'm pulling up. To be honest, I did not know you'd filed that. I had not gotten notification of that. I'll leave this to Justice McCanny and Justice Cates. I know, Ms. Nielsen, you addressed the Ward case. Do you need time to file any written response to what Mr. Harris has filed? Your honor, I don't believe that's necessary. I believe that I covered during my oral argument the state's position on that case and that we would just rest on our oral argument and the Is there a pending motion on that case? I'm pulling that up. There should be, your honor. If there's not, there is. I've got it. It was filed on the 21st. I apologize. It was only decided on March 31st, but it would have been filed on our behalf in a more timely fashion had we seen it earlier. Do and then there's no objection from the state that that motion will be granted? No, your honor. If opposing counsel believes it's relevant to their argument, we don't object to its use. Then we will grant that. We'll grant that motion showing no objection by the state. Um, and again, obviously it sounds like Miss Nielsen, you don't believe you need to file everything in writing. Um, so we will take this matter up with the case. Um, before we leave, uh, Justice McKinney, uh, or Justice Capes, do you have any final questions? No, nothing further. Nothing further. Well, thank you then counsel. Uh, this, uh, finishes our, uh, docket for the day. Um, at least our oral arguments. Uh, so this court will stand in recess until tomorrow morning at nine o'clock.